Good morning. May it please the Court, David Gardner for the petitioner, and I would like to reserve two minutes for rebuttal argument. In this case… Why don't you keep your voice up? Thank you, Your Honor. Thank you, Your Honor. I left my hearing aids at home. Okay. Let's start again. In this Court's decision in Wackery and subsequently Tambougoulon, in analyzing a disfavored group analysis, the Court found that an individualized risk of harm does not require individual targeting or being singled out. The petitioner here argues that she has a relatively low threshold to show individualized harm. Moreover, her situation is markedly distinct from the petitioner in Lelong, a 2007 case. Lelong was a student in the United States, studying when these 1998 riots took place. The petitioner was in Indonesia at the time of the riots. Her family, amongst others in the neighborhood, had to pay police protection to avoid her house being burned down. Her neighbor's houses were burned down. From early childhood, she was followed by children who identified her as a non-Muslim, pushing her in the back and throwing muddy water at her. Counsel, can you let me ask you, because there was a previous application in this case, what changed between the time of the first application and this one? The petitioner is relying on two expert affidavits, which show that there is a change qualitatively and also in the extent of the nature of violence against Christians and Chinese. Specifically, Professor Winters argues that the rise of radical political Islam has become institutionalized to the extent that the government cannot control it. And Professor Winters' argument is, in fact, also supported by the 2005 State Department report, which is also in the petition's motion, which indicates that the extent of corruption and weak government, the instability of the Indonesian government. Other instances of change include the imposition of Sharia law, while some in the regions. In 2001, the State Department report indicated that Sharia law was a minority opinion, that it was not mainstream. Professor Winters argues that this is now mainstream. A political party advocating for Sharia law. Doesn't this all just show that there's just a problem for Christians? It goes to show that what might have been seen as a local incident in the riots in 1998 has now become so pervasive that it is now institutional. Also, the nature of the violence has changed to the extent that it's part of an international movement. It's more susceptible to international influences. And according to Professor Winters, the rise of political Islam is unstoppable. When a vice president of the country advocates for an Islamic state when that was never the case previously, the petitioner argues that that is a material change. Ms. Zaney left the country, correct? Yes, Your Honor. Does that affect her right to file a motion here, to proceed with this motion? I believe that the departure rule does not apply in this circuit. Why not? Because she has a motion to reopen, and I don't believe that her departure rule applies. I thought that's where the departure rule applies, is on a motion to reopen. We've said it. We have a case, and we get the name of the case, that forced removal doesn't have any effect on that. The departure rule doesn't apply in that context. But in that particular case, we specifically left open the question of voluntary departure. The petitioner's position is that if she is placed in a position in this country for more than 10 years without work permission, without being able to resolve her case, with an approved family petition, with no other option, that her departure was not voluntary. It was constructive deportation or self-deportation, as was argued in the recent elections. We did not believe that's voluntary departure. Did she return to the ---- She has returned to Indonesia. To Indonesia. Yes, Your Honor. Okay. So getting back to Judge Hurwitz's question, the change that you're relying on is just the overall political change? Both the State Department and the expert agree that there's a cyclical nature to violence and that there are multiple factors to it. What the expert is saying that the rise of political Islam is now institutionalized. It's at a government level. It's also a populist movement and has substantially changed from local hatred to a national culture, which is very much significantly against Chinese and Christians. As I understand it, and I know you wanted to save some time for rebuttal, the first application, the BIA found that there wasn't a sufficient showing of an individualized fear of persecution. Is there any individualized showing this time? I mean, I know ---- I've heard what you've said about change conditions in the country. Is there anything in the record that shows an individualized fear of persecution? The motion, since the petition was here, her individualized ---- I mean, she'd been out of the country for that time. It would remain the same, except that subsequent to the first petition, this Court decided Sa'el, Wakry, and Tambunlan, which applied the disfavored group analysis. Moreover, the country conditions in this record, particularly the two expert affidavits which relate to the new conditions, are far more detailed than they were in the first. And your position is that the BIA, in effect, abused its discretion in finding that this just simply went to country conditions and they hadn't changed that much? Which is essentially what they said. They said conditions may have worsened a bit, but this is the same kind of evidence that you submitted the last time. Our position is that the BIA did not read the record. The BIA made a statement that the government does not condone the violence. Our expert indicated that, practically speaking, the Indonesian government either acquiesces to or is unable to control the violence. No, I understand your side of the case. I'm trying to find out what your position is in terms of our standard of review. This is a decision in the end for the BIA to make. Is it your position that on this record they could have made no different finding, or is it your position that they ignored something? Opposition is that they cited to the expert opinion but didn't read it or didn't analyze it or didn't draw the conclusions. How are we to know that? I mean, what you're saying is they drew a different conclusion than your expert, therefore, they must be wrong? The standard of court is for the board is to analyze the evidence. In this case, there were two very specific affidavits identifying both the issue of change of country conditions, the way it affected the Chinese community and also the Christian community, and the intertwined identity of this particular petitioner. The board failed to take into consideration, and there were very, very detailed sources, which included multiple State Department reports. The only reference to the evidence is the board's statement that the government of Indonesia does not condone violence. That, in our view, is an abuse of discretion. Thank you. Well, you made a motion to reopen. Yes, Your Honor. And can you be specific about what evidence was introduced by you on behalf of your client at that time showing that changed country conditions, the conditions in Indonesia worsen for ethnic Chinese Christians? Yes, Your Honor. The respondent put in support of the motion a... But, you know, you have to speak up. I'm sorry, Your Honor. I mean... Thank you. You're the first bashful Englishman I've met in a long time. Okay. You just can't talk to the mic like you're Winston Churchill. I need practice, Your Honor, but I'll try. Thank you. The respondent petitioner put in her own declaration saying she was a Chinese Christian woman who was aware of the country conditions, and there were two very detailed expert reports which showed that in 2004-2005, and in fact referring even to the 2003-2004 State Department reports, which said that the Indonesian government's position on religious freedom had retracted, in fact had gone backwards. So our expert evidence cites not only to his own sources but to the government's sources which say that the country conditions had changed. You're talking about Dr. Winters? Dr. Winters. All right. And what did he say? He said that the... You know, people are listening to you. They'd like to know what's going on. Yeah. He's saying that the violence, church bombings, terrorist bombings, are directly attributable to a rise of political Islam, which did not exist or was much weaker in 2000, that the support for political Islam, which would have directly affected persons in the petitioner's position, had been now given both populist support and government support, that hundreds of thousands of people were demonstrating in favor of an anti-pornography law, which is also in support of Sharia law at an institutional level, at a government level. The prior case, the State Department was very clear that the desire for an Islamic state was a minority position. In 2005, Professor Winters describes the rise of political Islam as unstoppable, and he believes that there's a change in the nature of the violence against the Chinese and Christian communities. All right. Thank you. Thank you. You're from the State Department? I'm from the Department of Justice, Your Honor. Department of Justice. Yes. May it please the Court, I'm Jason Weiskopf for Respondent Eric Holder. In this case, the Board did not abuse its discretion by denying the motions to reopen. The crucial element here is change of country conditions. Well, look, you know, we know there's a long history of persecution of ethnic Chinese Christians in that country. Isn't that true? It is correct, Your Honor. Yeah. It's been going on a long time. Correct. Correct. And if you read the papers, it's getting worse. Well, in this case, Your Honor, when looking at the evidence here, you actually have evidence in the record, including the 2005 State Department report that says there have been improvements in Indonesia as far as the government attempting to control the tension between the two groups. And again, the important element here is we're operating on an abuse of discretion standard. What was the record before the Board on the motion to reopen? We had Dr. Winter's affidavit in the 2005 State Department report. Was there anything else in that record? Correct. I believe there are some news articles in the record in addition to that. So there were those. There is a lot of evidence. Granted, there is some evidence that says, including the Winter's affidavit, that says that in some ways things are getting worse. But the Winter's affidavit also says there's a long ongoing history here. There's a lot of reference to Sharia law being imposed in Indonesia in certain parts of Indonesia. But even the Winter's affidavit, most of the statements in that are regarding the imposition of Sharia law to Muslims. A lot of the courts, a lot of the Sharia courts, apply specifically to Muslims. And so here the petitioner had to show material changed country conditions. Can I ask you a question about the petitioner's departure? Does that moot the case? Petitioner's departure in this case, it wouldn't moot this case, no, Your Honor. Not as far as I see it in that. But does it affect our jurisdiction? There is a difference between mootness and jurisdiction. I stand corrected and answer the corrected question. Right. And I was unaware that the petitioner had departed the country. The counsel filed a letter, I guess it was on Friday or Thursday, informing us that the petitioner had departed the country. Okay. I'm not actually aware. And he just confirmed that. He just confirmed that right here. Right. I haven't been back to the office since that point and haven't gotten it. But at this point I'd have to look at that to see if that would deprive this court of jurisdiction because that might play the departure bar into this at that extent, yes. Well, we have a case that says that the petitioner has filed a motion to reopen and it is forcibly removed. Uh-huh. But that does not affect our jurisdiction because we have the right to proceed to hear the motion and to resolve the issue. Right, right. As opposed to this instance where she voluntarily. She voluntarily. But we said in that particular case that we weren't addressing and there's a number of circuits around the country have said that every petitioner has the right to file at least one motion to reopen. Right. And they've said that voluntary departure doesn't affect their right. Right. I mean, as far as motion to reopen in that instance, as far as here where you have, and I think I'm not exactly understanding, it's starting to bleed over again into the voluntary departure issue where you start to go into data a little bit as far as that. The question, I guess, is after having filed a motion and having it adjudicated by the BIA and then someone voluntarily departs, does that affect our jurisdiction? That's something I would have to look at, Your Honor. I'd have to look at that more. I know there are some cases that say having voluntarily departed or you still have your right to file your one motion. The question is whether it occurs after. Correct, Your Honor. And I would need to look at that more, and I wasn't prepared for that. We just learned about it this week. Yes, yes. So I wasn't aware of that, Your Honor. So, again. Well, did you read all these various exhibits that are in the record here that I believe was Professor Winters introduced? I did read, yes, Your Honor. You know, it sounds pretty terrible when you read it, but they're saying they will bring more violence into their territory. Local authorities in the reign of Jaya refused to allow ferry carrying over 1,200 refugees to berth. So you had refugees fleeing months of bloody Muslim-Christian clashes and Indonesia's Maluku Islands are now facing rejection in several Indonesian provinces. And you had a ferry carrying 4,215 passengers, 1,207 of them were refugees, and they remained impounded. And you had the main city of this particular province and local authorities refused the ferry permission to berth and disembark the refugees. It goes on and on and on. Yes, Your Honor. You know, she's back there. She took voluntary departure. She has a son here who is an American citizen. And we don't know what his present status is, whether he has children that would be her grandchildren. But if you read all this information from their 22 killed in latest Maluku coup violence, 60 people were hurt as hundreds of homes were burnt down. Talks about heavily armed men attacked and raised in mainly Christian village in Indonesia's ravaged Spice Islands.  And again, Your Honor, yes, there is evidence in the record of that ongoing conflict. And again, this court has talked about that. In the sale case, it talked about the history, the long ongoing history, of tension between Muslims and the Christian minority in Indonesia. So again, but the important note here is that the petitioner had to show a change from the underlying proceedings to excuse the untimeliness of the motion. Because this is a petition to reopen, if this were an original application. Yes. And my question is, is the quality of the evidence different in this case than in any of our previous Indonesia cases? Here, it's actually very similar, especially to one of the cases, Halim, where the court did not find that the petitioner was eligible for relief. Here, you have the petitioner. She testified about, individually, she testified about things that happened in the distant past. Rock throwing, harassment at school, things like that from a very distant time. She testified about the 1998 riots. However, she also testified that authorities protected her home during those riots. I was focusing on Dr. Winner's affidavit. Hasn't that been before? Similar evidence been before the BIA in other cases that we've had? Yes. Yes, Your Honor. Your Honor, that evidence has been before the BIA. I'm not exactly sure which case, the name of that specific case, where it came up here. But evidence either like Dr. Winner's report or evidence, Dr. Winner's report itself has been stated here. And again, you have the abuse of discretion standard we're looking at here. You have the 2005 State Department reports that say things are actually improving. There is multiple, there is conflicting evidence in the record. But again, we're operating on abuse of discretion standard. So it has to be shown that the agency actually abused its discretion. I mean, you go through this, looting a victim's house, threatening to burn down the house, forced the victim's son to rape his younger sister. Of course, the mail house made to rape the mother of the family, gang rapes. It's a pretty bad place, what goes on with the ethnic Chinese Christian. Your Honor, again, I do acknowledge that there is evidence in the record of the ongoing tension between the two factions in Indonesia, yes, Your Honor. Well, has there been a change in the government's attitude in this area with these people? As far as the Indonesian government's attitude, Your Honor? No, our government. I'm not exactly sure what your specific question is. What did you say? I'm not exactly sure what you mean. Well, do we have a kinder, gentler government now? I would like to believe so, Your Honor, yes. So why don't you do something about it? Well, again, you have, you necessarily, you do have the prosecutorial discretion initiative going on right now through the Department of Justice and the Department of Homeland Security as it applies to immigrant cases. But essentially, I mean, our office does review cases like this for prosecutorial discretion and find those cases that meet certain criteria and forward those to the Department of Homeland Security. But the Department of Homeland Security is still the entity that makes the final call on prosecutorial discretion. And again, I can speak for the Department of Justice and that we are going through these cases and it's an evolving process, ongoing, looking for cases that warrant that type of discretion, yes. If that's all. We've had some success recently in sending these matters to arbitration. Your Honor, this case has already been in mediation and this case has... So has the other one that I'm thinking about. Yes, Your Honor, and... It's one of my cases, so... Correct, Your Honor. And so the case was previously in mediation. Since the Morton memos have been issued, I have specifically looked at this case and it has been... When was it in mediation? It was in mediation years ago. Yeah, well, how many years ago? You're supposed to know the record. Right, Your Honor. I believe it was in 2007. I'm not exactly sure on the exact date. That was before the Morton memo. It was, it was. Yeah, before the Morton memo, yeah. Correct, Your Honor. And since then, I've also undertaken a separate review of it. Since that instance where it has again gone through the process where it's gone through review by our office and the Department of Homeless Security. And they have deemed not to, they've decided not to exercise prosecutor discretion. Has Osuna looked at this? Do you know him? I am not aware of who that is specifically. He's in the Justice Department. His job is to handle these matters. Agreed, Your Honor. And the Department of Justice has looked at it. But the Department of Homeless Security is actually in these instances the entity that makes the final call on that, on prosecutor discretion. Well, I know there's a lot of bureaucracy out there. But this case, this case came way before the Morton memo came out. Before it changes, taking place slowly. And so here you've got a woman. She's probably not going to be able to get back here for at least 10 years. It's not a young woman. Her son's here. I don't know whether he's married now, whether there's grandchildren involved. This case was first filed when? The initial underlying decisions were issued in 2003. What? 2003 is when the initial decisions were. So it's going to be almost 10 years. Correct, Your Honor. And, again, it's a decision for the Department of Homeland Security to make. Don't blame them. Well, again, Your Honor, this is a case that I had gone through and reviewed specifically. But it was determined. And, again, there are. . . Have you recommended any cases go to mediation considering the Morton memo? I have in other cases, Your Honor. This case, I would not. The case here, again, you have the petitioner, all things said, the petitioner violated her voluntary departure agreement. She was found not credible by the agency in the underlying proceedings. There are negative factors in this case in addition to the positive ones. There are a lot of positive factors. Correct, Your Honor. But it is a prosecutorial discretion, and that's confined to the discretion of the agency and outside this court's jurisdiction. And that issue, in any event, is not before us. Correct, Your Honor. The petitioner had argued that in the brief. There's nothing to stop us recommending that this matter go back for arbitration. Well, Your Honor, I respectfully think that would be a waste of time. This has already been mediation. How do you know it's a waste of time? Your Honor, this case has gone through mediation once prior to the Morton memo. After the Morton memos were issued, it was reviewed to see if prosecutorial discretion was appropriate, at which time it was deemed it was not. So sending it back to mediation would essentially be sending it back to, again, for us to, again, decide. When they started reviewing these cases under the Morton memorandum, very few of these cases were considered eligible to receive that benefit. They went through thousands of our cases, and very few of them got picked up. Now, more and more are. Well, I can't speak to the exact number that have been picked up, but specifically in regards to this case, this is one where I have the DHS has been involved in the process and has declined to exercise prosecutorial discretion after the Morton memos have been issued, after it has been read and considered. So, again, I don't believe that further mediation on this point would be helpful at all. We can't make you do it. We can't make you exercise discretion. That's your decision. Respectfully, Your Honor, that's correct. It's outside this Court's jurisdiction. Well, but we can recommend that the matter go to our circuit mediator and invite the government to participate. Yes, Your Honor. You could direct us to do that. Again, I think that would be... We could be kind and gentle as we do it. Your Honor, again, I think the government has been fair in this instance. It has provided... Well, I don't think so. Well, again, Your Honor, I respectfully, I disagree. I think that the agency has done its best to provide due process to the petitioner in accordance with the law. All right. Thank you. Thank you, Your Honor. Thank you, Your Honor. And I would like to address the issue of prosecutorial discretion and just bring to the Court's attention that the discussions at the time were premised on a legal theory that the petitioner here was barred from reopening her case, and she had an approved I-130 petition. She was eligible to adjust. And the government and also the Board refused to reopen Sua Sponti on the assumption that because she overstayed voluntary departure, she was unable to adjust. Subsequently, this Court remanded back Nevarez-Nevarez, and the Board has acknowledged that in some cases, in that case, a motion to reopen could trigger what would the Supreme Court in Dada call the constructive withdrawal of voluntary departure. That's a legal issue. The legal issue was not considered by the government and it was not considered by the Board. If a petition was a constructive withdrawal of voluntary departure, wouldn't we have everybody who filed the petition then be subject to removal? Your Honor, the new rule subsequent to Dada is that it does in fact make them subject to removal. And that's so we would have to deal with a motion to stay removal in every case. I mean, one of the virtues of the current system is the petition. People remain here while we deal with the petition. The current system, the petitioner's case is in a time warp. There's a body of individuals. Right. I know we've got people from the old cases. From the old cases. But in all those cases, I take it they would be subject to immediate removal if the petition was a withdrawal of voluntary departure. The government has discretion to stay removal and this Court has a legal standard in which to exercise that. I'm just trying to figure out whether we're going to end up with hundreds of applications under your theory of the law. With respect, Your Honor, we believe that this case is actually – those cases are running out because very few people are able to sustain that amount of time to remain here. The other point, very quickly, if it may please the Court, I would like to address the prior case law. In the long – this Court relied on a State Department report which indicated the Indonesian government was attempting to correct and improve conditions. Professor Winters indicates in 2003 and 2004 the State Department said that it was unable to control religious extremists. Professor Winters believes that the State – institution of the State has broken down. The 2005 report indicates that there's widespread corruption and impunity. The breakdown of the government, the inability of the government to control the violence is itself a changed condition. And finally, the Board did not – this Court – the Board did not uphold the adverse credibility finding. In the case of Halim, cited too by counsel, Halim was male. He was found not credible. He attended a Catholic school. But unlike the petitioner, there's no evidence that he attended church every week. So the evidence here is that she has a double risk, both as Chinese and as a Christian, and she's an active Christian. She carried her Bible to church every week. That provides the individualized risk. And the evidence here is that there were substantial changes at a governmental level with respect to the treatment of the Christian and Chinese minorities. Thank you. All right. Thank you. The matter is submitted.
judges: Pregerson, Paez, Hurwitz